UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 FEB -8  AM 10: 43

CLERK

BY_____
DEPUTY CLERK

MATTHEW NEW,                          )
                                      )
    Plaintiff,                        )
                                      )
v.                                    )          Case No. 5:16-cv-93
                                      )
NANCY BERRYHILL, Acting               )
Commissioner of Social Security,[1]   )
                                      )
    Defendant.                        )

**OPINION AND ORDER**
**(Docs. 6, 7)**

    Plaintiff Matthew New brings this action under 42 U.S.C. § 405(g), requesting reversal of

the decision of the Commissioner of Social Security denying his applications for supplemental

security income ("SSI") and disability insurance benefits ("DIB").  Pending before the court is

Mr. New's motion to reverse the decision of the Commissioner (Doc. 6) and the Commissioner's

motion to affirm (Doc. 7).  For the reasons stated below, the court GRANTS Mr. New's motion,

DENIES the Commissioner's motion, and REMANDS for further proceedings and a new

decision.

## Background

    Mr. New was 24 years old on his alleged disability onset date of April 20, 2008.

(AR 63.)  On that date, he was working as a machine operator for Ellison Surface Technologies,

and he walked off the job because of a conflict with a coworker that he says caused his social

anxiety to reach a "climax."  (AR 42, 233.)  He has not looked for work since then.  (AR 42.)  He

testified that, since April 20, 2008, his physical abilities have been limited because of his back.

---

[1] The court has amended the caption to reflect the current Acting Commissioner of Social
Security, who assumed office on January 20, 2017.  *See* Fed. R. Civ. P. 25(d).

(AR 43.)  He asserts that he has spinal fractures and five compression fractures.  (AR 232.)
Mr. New's fiancée, Stephanie Stewart, testified that she has been living with him since 2007, and
that Mr. New has trouble staying in a still position, needs to shift his body every 15 to
20 minutes, and experiences increasing back pain the longer he stays still.  (AR 50.)  She further
testified that mornings are particularly difficult for Mr. New, and that it takes one to two hours
for him to be able to move somewhat freely each morning.  (AR 50–51.)

Mr. New testified that he has social anxiety and other psychological problems that limit
his ability to work.  (AR 45, 47.)  He also asserts that he has depression.  (AR 232.)  Ms. Stewart
testified that Mr. New "has trouble speaking with anybody that's outside of his very small
circle"; that he gets "extremely anxious and nervous and fidgety"; and that he has "trouble
expressing himself directly or indirectly."  (AR 51.)  She further testified that Mr. New needs
prompting to initiate tasks, and that he has trouble finishing tasks because he gets distracted
easily.  (*Id.*)[2]

Mr. New dropped out of school in the tenth grade; he has not attempted to obtain a GED.
(AR 41–42.)  He has previous work experience as a circuit board assembler and as a dishwasher.
(AR 42; AR 283.)  He is the father of two young children.  He testified that on a typical day he
stays home and tries to take care of them.  (AR 46.)  He testified that he tries to do some
housework, as best he can, but that he does not do any yard work.  (*Id.*)  He plays chess on the
computer occasionally.  (AR 47.)

---

[2] The ALJ gave Ms. Stewart's testimony only "limited weight," reasoning in part that she
testified that Mr. New could not sit still and had to keep shifting, whereas the ALJ observed that
Mr. New sat comfortably without shifting during the hearing.  (AR 30.)  That is not a strong
basis for discounting Ms. Stewart's testimony.  *See Menard v. Astrue*, No. 2:11-CV-42,
2012 WL 703871, at *7 (D. Vt. Feb. 14, 2012) (noting criticism of the so-called "sit and squirm"
index).  The ALJ also reasoned that portions of Ms. Stewart's testimony lacked support in the
medical records.  (*See* AR 30.)  The court discusses the medical records in detail below.

An August 9, 2012 function report—filled out by Ms. Stewart—indicates that Mr. New's daily activities involve caring for the two children and for pets; that he has no problems with personal care other than needing reminders to take medication; that he can prepare simple meals daily; and that, with direction, he can do light repairs and light cleaning around the house, provided that he takes breaks. (AR 267–69.)[3]  The function report further indicates that Mr. New is able to drive a car and go shopping, but that he is unable to manage money or remember due dates or deadlines.  (AR 270.)  According to the report, Mr. New used to enjoy watching TV, playing video games, hiking, biking, and canoeing, but the only thing he is able to do regularly now is spend time with the two children.  (AR 271.)  His social activity is limited to spending time with his family; he reports being anti-social and having no friends.  (AR 271–72.) According to the function report, Mr. New's physical and other abilities are limited; he can pay attention for only five minutes, has difficulty following spoken instructions, handles stress and changes in routine poorly, and fears meeting people and going to crowded places.  (AR 272–73.)

Mr. New protectively filed applications for DIB and SSI in April 2012.  (AR 202, 206.) His claims were denied initially on June 6, 2012 (AR 121, 124), and upon reconsideration on September 7, 2012 (AR 130, 137).  He requested a hearing (AR 144), and Administrative Law Judge (ALJ) Thomas Merrill conducted an administrative hearing on May 19, 2014.  (AR 38– 62.)  Mr. New and Ms. Stewart both testified at the hearing, where Mr. New was represented by Attorney Bryden F. Dow.  Vocational Expert (VE) Christine Spaulding also testified.

On June 25, 2014, the ALJ issued a decision finding Mr. New not disabled under the Social Security Act from his alleged onset date of April 20, 2008 through the date of the decision.  (AR 20–32.)  Mr. New appealed, and on February 10, 2016 the Appeals Council

---

[3] In addition, the record contains an April 26, 2012 function report, also filled out by Ms. Stewart.  (AR 251–58.)  The April report is substantially similar to the August report.

denied his request for review.  (AR 1.)  Mr. New filed his Complaint on April 11, 2016.

(Doc. 3.)

## **ALJ Decision**

The ALJ is required to follow the five-step process in determining a claimant's disability.

*Machia v. Astrue*, 670 F. Supp. 2d 326, 333 (D. Vt. 2009) (internal citation omitted);

*see* 20 C.F.R. §§ 404.1520; 416.920.  The answer at each step determines if the next step need be

addressed.  *Machia*, 670 F. Supp. 2d at 330.  At the first step the ALJ determines if the claimant

has engaged in Substantial Gainful Activity since the alleged onset date of his disability.  *Id.*  If

the answer is no, step two then asks if the claimant has any "impairments" that are "severe."  *Id.*

If there is one or more severe impairment, step three evaluates whether any of these

impairments meet the listed impairments in Appendix 1 of the regulations.  If an impairment

meets the listing the claimant is deemed disabled.  If it does not, step four asks whether the

claimant retains the residual functional capacity ("RFC") to do his past relevant work.  *Id.*  If the

claimant can no longer do his past relevant work, step five asks whether the claimant is able to

do any job available in significant numbers in the national economy.  *Id.*  "The claimant bears

the burden of proving his case at steps one through four, . . . and at step five, there is a 'limited

burden shift to the Commissioner' to 'show that there is work in the national economy that the

claimant can do.'"  *Larkin v. Comm'r of Soc. Sec.*, No. 2:10-CV-291, 2011 WL 4499296, at *2

(D. Vt. Sept. 27, 2011) (quoting *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)).

The ALJ found at step one that Mr. New had not engaged in substantial gainful activity

since April 20, 2008, the alleged onset date of disability.  (AR 22.)  At step two, the ALJ found

that Mr. New had no medically determined mental health condition or physical condition to

support his Title II (DIB) claim.  (AR 23.)  The ALJ reasoned that Mr. New met the insured

status requirements for DIB through December 31, 2010, but that he had not established any mental health condition or physical condition prior to that date. (*See* AR 20, 22–23.) Also at step two, the ALJ found that, for Mr. New's Title XVI (SSI) claim, he did have medically determinable impairments consisting of back pain status post spinal fractures, social anxiety, and depression. (AR 22.) But the ALJ concluded that none of Mr. New's impairments, alone or in combination, constituted a "severe" impairment. (AR 23–32.)

The ALJ also found that, under the Medical Vocational Grid Rules, 20 C.F.R. Part 404, Subpart P, Appendix 2, Mr. New "is not disabled under all subcategories of a younger individual with a medium work capacity, capable of perform[ing] all medium, light, and sedentary work." (AR 28.) The ALJ further found that, even assuming severe mental impairments, Mr. New "would be able to perform the entire unskilled occupational base." (See AR 31.)

## **Standard of Review**

Disability is defined by the Social Security Act in pertinent part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court conducts "'a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have

5

been applied.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per

curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)); *see also* 42 U.S.C.

§ 405(g). "Substantial evidence means 'more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Poupore*,

566 F.3d at 305 (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.*, 305 U.S. 197,

229 (1938)). The "substantial evidence" standard is even more deferential than the "clearly

erroneous" standard; facts found by the ALJ can be rejected "only if a reasonable factfinder

would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d

1287, 1290 (8th Cir. 1994)). The court is mindful that the Social Security Act is "a remedial

statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773

(2d Cir. 1981).

## Analysis

Mr. New contends that the ALJ erred in four ways: (1) by setting his own expertise

against that of physicians who provided opinions; (2) by failing to properly weigh treating source

statements; (3) by not following the factors in 20 C.F.R. § 404.1527(c)(2); and (4) by finding that

Mr. New had no severe impairments at step two of the analysis. (*See* Doc. 6.) The

Commissioner asserts that each of Mr. New's four points raises the same argument: that the

treating-source opinions of Dr. Michael Scovner (Mr. New's primary-care provider since

childhood) and Jacquelyn E. Bode, M.Ed. (a psychologist who treated him in 2014), establish

that Mr. New had severe physical and mental impairments, and that the ALJ erred in failing to

give more weight to those opinions. (Doc. 7 at 11.) The Commissioner maintains that

substantial evidence supports the ALJ's decision, and that the correct legal standards were

applied.

I.       **Severity**

An impairment is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," such as physical functions, ability to see, hear, and speak, to understand and carry out instructions, and to use judgment and respond appropriately to supervision and co-workers. *See id.* §§ 404.1521(b), 416.921(b). "[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). Thus, "[a] claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the [claimant's] physical or mental ability(ies) to perform basic work activities." SSR 85-28, 1985 WL 56856, at *3 (1985).

A.       **Back Pain**

Mr. New maintains that the ALJ erred by failing to find that his back pain is a "severe" impairment. The ALJ gave "little weight" to the treating source statement completed by Mr. New's treating physician, Dr. Scovner, on May 2, 2014. (AR 27.) According to the ALJ, the medical records do not support the limitations that Dr. Scovner described. The Commissioner maintains that the ALJ provided good reasons for not according Dr. Scovner's opinion significant weight.

1.       **Medical Opinions**

As noted above, Dr. Scovner has been Mr. New's primary care physician since childhood. In his May 2, 2014 statement, Dr. Scovner indicated that Mr. New's diagnoses include low back pain and thoracic back pain, and that his prognosis is "poor." (AR 594.) He

opined that, because of Mr. New's symptoms, he would be "off task" for two hours in an eight-hour work day. (AR 595.) He assessed limited abilities to lift and carry, and that in an eight-hour work day, Mr. New could only sit for a cumulative total of four hours and could only stand and walk for two hours. (*Id.*) He opined that, in an eight-hour work day, Mr. New would need to get up and walk for 10 minutes every half hour; that he would need to take 20-minute unscheduled breaks every hour; and that he would need to lie down for about a half hour out of every four hours. (AR 596.) Dr. Scovner also opined that Mr. New is limited to 15 minutes of overhead reaching in an eight-hour work day, and five minutes of stooping or crouching. (AR 596–97.) According to Dr. Scovner, Mr. New would likely be absent from work for more than four days per month due to his impairments, treatment, or symptom flare-ups. (AR 598.) Dr. Scovner indicated that the earliest date for the limitations he described was April 20, 2008. (*Id.*)

Under the treating-physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Even when a treating physician's opinion is not given controlling weight, it is still entitled to some weight because treating physicians are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence . . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating physician's opinion is not given controlling weight, the weight to be given the opinion depends on several factors: (1) the length of the treatment relationship and the frequency

of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is of a specialist; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). The Commissioner is required to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

As to the ALJ's determination at step two, the court concludes that the ALJ erred insofar as he gave Dr. Scovner's opinion insufficient weight to support a finding of "severe" back pain. The ALJ reasoned that Dr. Scovner's own medical records do not support the extensive physical limitations described in his May 2, 2014 opinion. (AR 27.) But, as described below, the medical records document a physical impairment that is more than "minimal."

The record contains Dr. Scovner's office treatment records (and incorporated copies of other treatment records) between May 16, 2006 and March 27, 2012 (AR 379–426), with additional records between July 30, 2012 and December 13, 2013. (AR 457, 543–93.) Hospital records indicate that Mr. New was admitted to the Rutland Regional Medical Center (RRMC) on October 5, 2006 "for a possible seizure that was witnessed by his girlfriend." (AR 417.) The hospital record states that Ms. Stewart reported that during the seizure, Mr. New had a "fully arched back." (AR 421.) At the hospital, Mr. New complained of stomach pain and "numbness all over his body." (*Id.*)

Dr. Scovner's treatment notes from October 2006 through April 2010 do not mention any complaints of back pain. But at a December 22, 2010 appointment with Dr. Scovner, Mr. New did complain of back pain "up and down [the] spine into [the] shoulder and into the front." (AR 403.) Dr. Scovner's comments from that date indicate that Mr. New's "[b]ack [was] injured

after [a] seizure several years ago." (*Id.*)  At an appointment on February 3, 2011, Mr. New

presented with back and shoulder pain.  (AR 402.)  Dr. Scovner's comments indicate that

Mr. New had fallen down stairs twice two weeks ago, and that he had been doing a lot of

shoveling.  (AR 402.)  Dr. Scovner diagnosed "[s]evere low back pain," prescribed Vicodin, and

ordered x-rays.  (*Id.*)

Imaging on February 12, 2011 showed "loss of height of L2 that may be due to a pre-

existing compression" and that the compression "may be chronic."  (AR 401.)  Mr. New

continued to complain of back pain at a March 8, 2011 appointment, and Dr. Scovner prescribed

physical therapy (PT).  (AR 400.)  Mr. New continued to complain of back pain at appointments

on April 8, 2011, May 20, 2011, and June 30, 2011.  (AR 397–99.)  A note from RRMC dated

July 11, 2011 indicates that Mr. New had been referred for PT, but that he was being discharged

because he did not return RRMC's communication to schedule an appointment.  (AR 396.)

On January 10, 2012, Mr. New started physiatry at RRMC's outpatient physiatry clinic to

treat back pain.  (AR 387.)  At that initial appointment with Dr. Arabella Bull-Stewart, D.O.,

Mr. New reported that he had been experiencing back pain since 2006, and that the pain had

become progressively worse over time.  (*Id.*)  Dr. Bull-Stewart performed a physical

examination, and noted that Mr. New was able to sit on the exam table comfortably and to walk

without difficulty, but that he had "tenderness throughout his back and both the paraspinal

musculature of the lumbar, thoracic, and cervical region as well as along the spinous process of

the cervical, thoracic, and lumbar region."  (AR 388–89.)  Dr. Bull-Stewart's impression was

that Mr. New had neck and thoracic back pain, and "[c]hronic low back pain with L2

compression fracture with right lower extremity radiculopathy."  (AR 389.)  She ordered an MRI

10

of the lumbar spine and x-rays of the thoracic and cervical spine. (*Id.*) She also planned to order PT after reviewing the imaging results. (*Id.*)

The MRI showed "[s]light loss of height at L2 consistent with previous trauma." (AR 340.) The cervical x-ray was negative (AR 342), but the thoracic x-ray showed "moderate compression of T5" with "[m]ininal loss of height . . . present at T4, T6 and T7" (AR 341). At a February 10, 2012 visit, Dr. Bull-Stewart reviewed the imaging results with Mr. New, noting that the imaging revealed "no acute pathology." (AR 469.) But she found that Mr. New had "[c]hronic low back and mid back pain" and enrolled him in PT. (AR 470.) At a March 13, 2012 visit, Dr. Bull-Stewart noted that Mr. New inquired whether he would qualify for disability, and that she "counseled him about avoiding heavy manual labor," but "suggested that he could certainly participate in non-physically taxing work." (AR 466.) She also noted that Mr. New would be meeting with Dr. Matthew Zmurko regarding potential orthopedic intervention, and that he was to start PT on March 19. (AR 466–67.) At a March 15, 2012 consultation with Dr. Zmurko, the orthopedic clinic also recommended formal PT. (AR 533.)

Meanwhile, Dr. Scovner continued to note Mr. New's complaints of back pain at appointments on January 31, 2012, February 16, 2012, and March 27, 2012. (AR 383–86.) At the January appointment, Mr. New reported that the pain was becoming "far more intense" and that it hurt to do most activities. (AR 386.) Upon physical exam, Dr. Scovner remarked "[p]ain in lower back radiating down right." (*Id.*) He prescribed Tylenol 3. (*Id.*) At the February appointment, Dr. Scovner commented that "[s]evere back pain persists with multiple areas identified" and that Mr. New was having trouble sitting. (AR 385.) Dr. Scovner also commented that Mr. New had "[s]evere back pain to palpation." (*Id.*) He prescribed Vicodin. (*Id.*) At the March appointment, Dr. Scovner noted that Mr. New had "a week in terrible pain,"

11

and observed pain in the thoracic and lumbar spine upon physical examination.  (AR 383.)  He again prescribed Vicodin.  (*Id.*)

Mr. New attended PT sessions at RRMC between March 19, 2012 and May 11, 2012.  A pain assessment on March 19, 2012 indicated that Mr. New's pain increased with bending and walking, and also increased with sitting for more than five or ten minutes.  (AR 519.)  The physical therapist assessed Mr. New's impairments or limitations as follows: "Pain limiting function, Range of motion deficits, Strength deficits, Other: postural deficits."  (AR 521.)  According to the initial PT clinical summary, Mr. New was expected to "benefit [from] PT to address his limitations," and he "most likely will require [functional] restoration type of progression."  (AR 522.)  Mr. New attended PT sessions in March and early April 2012.  (AR 501–514.)  He met with Dr. Bull-Stewart on March 29, 2012, and reported that he had been going to PT sessions "religiously," but that he felt "excruciating pain while he is doing the therapy."  (AR 508.)  Dr. Bull-Stewart advised continuing with PT, but modifying exercises so that Mr. New could tolerate them better.  (AR 509.)

The PT records show relatively little activity in April, and on May 10, 2012, Mr. New returned to PT "after a long break and difficulties adhering to PT scheduled appointment."  (AR 525.)  At that appointment, he requested continuing the program independently at home, citing inability to attend appointments due to financial constraints and the anticipated arrival of a new baby.  (AR 525–26.)  He was discharged to do his PT work independently at home.  (AR 526.)

Mr. New returned to Dr. Bull-Stewart for appointments on June 5, June 21, and July 19, 2012.  (AR 447–54.)  Discussions at those appointments included the recent birth of his second son, Mr. New's medications, symptoms, results from a June 19, 2012 MRI, and Mr. New's

12

assertion that he discontinued PT because of an extended period of severe back pain.  At the

July 19 appointment, Dr. Bull-Stewart noted that Mr. New gave an "[i]nconsistent story

regarding opiate pain medication," and decided not to prescribe any more opiates to him.

(AR 448.)  Dr. Bull-Stewart next saw Mr. New on September 5, 2012, and he continued to report

back pain.  (AR 491.)  Dr. Bull-Stewart ordered PT for a possible shoulder condition.

(*See* AR 492 ("Possible right supraspinatus impingement syndrome.").)  She also dispensed a

transcutaneous electrical nerve stimulation (TENS) unit for Mr. New's back pain.  (*See id.*)

 At an appointment with Dr. Scovner on September 14, 2012, Mr. New continued to

report severe back pain, with symptoms that worsened during the day, stiffness, and spasms.

(AR 591.)  At an appointment on November 30, 2012, Dr. Scovner noted: "Hurts to get out of

bed.  No longer in therapy.  Doing exercises at home[;] situation is getting worse.  Pain meds

allow him to bend over and take care of his family."  (AR 589.)  At a December 27, 2012

appointment, Dr. Scovner noted: "Hurts to bend over[;] hard to get up stairs.  Gets better

mobility and sleeps better with meds.  Allows him to also take care of family."  (AR 587.)  On

January 17, 2013, Dr. Scovner wrote: "Severe lower back pain persists.  Just recently started

taking care of a new baby.  Back has gotten more swollen."  (AR 586.)  On February 19, 2013,

Dr. Scovner wrote: "Hurts to bend over.  Hard to do stairs.  Meds allow him to do activities and

take care of his family."  (AR 583.)  At a March 13, 2013 appointment, Dr. Scovner noted:

"Went to physiatry yesterday.  Back pain continues.  Worse in the AM.  Very stiff.  [M]eds allow

him to do chores around the house and help take [care] of kids."  (AR 577.)  Dr. Scovner wrote

similar comments for appointments on April 1, 2013 (AR 575) and April 24, 2013 (AR 572).

 Throughout the period from November 30, 2012 to April 24, 2013, Dr. Scovner

continued to prescribe Vicodin.  (AR 589, 588, 585, 584, 577, 576, 571.)  Dr. Scovner stopped

the Vicodin prescription after April 2013, and at a May 17, 2013 appointment, Mr. New reported

having trouble dealing with being off of that medication.  (AR 570.)  On July 29, 2013,

Dr. Scovner noted: "Hurts to bend over or crouch down.  Able to help with some chores around

the house."  (AR 562.)

Medical records indicate that by October 2013, Dr. Scovner had referred Mr. New to the

neurology clinic at the Dartmouth-Hitchcock Medical Center (DHMC).  (AR 545.)  After

conducting an examination, Dr. Tracie Caller at DHMC concluded that Mr. New had "[c]hronic

low back pain and myofascial pain syndrome likely secondary to compression fractures in the

thoracic spine."  (AR 548.)  She recommended following up with the spine clinic, and ongoing

exercise.  (*Id.*)  Dr. Rowland Hazard of DHMC also met with Mr. New, and recommended

consideration of "intensive rehabilitation."  (AR 551.)  Dr. Scovner's records for the months in

2014 prior to his May 2, 2014 treating source statement continued to note Mr. New's diagnoses

as including back pain.  (AR 609, 607.)

The medical records establish physical impairment that exceeds the "de minimis"

standard at step two.  The ALJ recognized that Mr. New suffers from a medically determinable

impairment of "back pain status post spinal fractures."  (AR 22.)  The medical records described

above establish that the impairment has more than a minimal effect on Mr. New's physical

ability to perform basic work activities.  That is particularly evident in Mr. New's longstanding

complaints of back pain, observations at physical examinations of a tender and swollen back,

accompanying diagnoses, imaging results, findings of physical limitations at PT appointments,

notations of limited mobility, and various strategies for treatment that included medication,

physiatry, PT, a TENS unit, and recommendations for intensive rehabilitation.  *Cf. Wallace v.*

*Comm'r of Soc. Sec.*, No. 5:11-cv-26, 2012 WL 461809, at *3–4 (D. Vt. Jan. 10, 2012) (no error

in finding claimant's back pain was non-severe, where pain occurred only at rare intervals, symptoms resolved spontaneously, and where evidence showed that it was caused by increased physical activity, and claimant did not seek medical attention to treat it).

The ALJ also sought to support his analysis of Dr. Scovner's May 2, 2014 opinion by contrasting it with Dr. Scovner's opinion on a Vermont temporary medical deferment form dated March 13, 2013.  (AR 27.)  In his 2013 opinion, Dr. Scovner indicated that Mr. New could sit for up to eight hours per day (AR 578), whereas in his 2014 opinion, Dr. Scovner opined that Mr. New could only sit for a cumulative total of four hours per day (AR 595).  In the 2013 opinion, Dr. Scovner wrote that Mr. New could stand for up to four hours per day (AR 578), but in his 2014 opinion, Dr. Scovner opined that Mr. New could only stand and walk for a cumulative total of two hours in an eight-hour work day (AR 595).  Those differences do not justify the ALJ's determination to give Dr. Scovner's May 2, 2014 opinion insufficient weight to support a finding of "severe" back pain.  Notably, Dr. Scovner's March 13, 2013 opinion states that Mr. New suffers from "severe back pain," and that Mr. New is not able to perform work or work activities.  (AR 578.)

In addition, the ALJ asserted that Dr. Scovner's treatment notes "contain no assessment of the claimant's functional abilities let alone mention of limitation with regard to standing, walking, or sitting." (AR 27.)  After reviewing the relevant record, however, the court finds that Dr. Scovner's treatment notes support the conclusion that Mr. New's back pain had more than a minimal impact on his physical ability to perform basic work activities.  On December 22, 2010 and after, the treatment notes consistently refer to back pain, and multiple entries refer to Mr. New's difficulty sitting, bending over, doing stairs, crouching, getting out of bed, and performing "most activities."  Notes from other providers include even more specific

15

assessments of functioning, especially Dr. Bull-Stewart's comment that Mr. New could participate only in non-physically taxing work, and physical therapist's assessment that he had "[p]ain limiting function, Range of motion deficits, Strength deficits, Other: postural deficits." (AR 521.)

Similarly, the ALJ erred in giving "limited" weight to the opinions of state agency consultants insofar as the ALJ concluded that those opinions did not support a finding of "severe" back pain. (*See* AR 29.) Dr. Patricia Pisanelli opined on May 7, 2012 that there was insufficient evidence to evaluate Mr. New's claim between April 20, 2008 and February 11, 2011. (AR 68.) But for the period between February 11, 2011 and May 7, 2012, she opined that that Mr. New had exertional and postural limitations, including limitations in lifting and carrying (occasionally 50 pounds and frequently 25 pounds), and in sitting, standing, and walking (six hours in an eight-hour work day). (AR 70.) Dr. Geoffrey Knisely came to the same conclusions on September 6, 2012. (AR 96–97; 99–100.)

Those opinions describe more than a "minimal" effect on Mr. New's physical abilities. The ALJ decided to give the opinions of Dr. Pisanelli and Dr. Knisely "limited weight" because "the additional objective medical evidence is essentially normal." (AR 29.) As described above, however, the medical records establish physical impairment that exceeds the "de minimis" standard at step two.

### 2. Credibility

Because Mr. New's physical symptom is pain, the ALJ was required to make a finding about the credibility of Mr. New's statements about his symptoms and its functional effects. SSR 96-7P, 1996 WL 374186, at *1 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1529, 416.929. The ALJ must first establish that there is a medically determinable impairment that could

reasonably be expected to produce the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b).  Here, medical imaging showed at least one compression fracture in the spine, and medical professionals repeatedly concluded that the spine injuries were related to the pain that Mr. New was reporting.  The ALJ noted that the imaging showed no evidence of "acute" pathology (AR 28), but Mr. New's complaint is of *chronic* pain.

Since there is a medically determinable impairment that could reasonably be expected to produce Mr. New's symptoms, the ALJ was required to evaluate the intensity and persistence of the symptoms to determine how they limit the claimant's functioning.  20 C.F.R. §§ 404.1529(c), 416.929(c).  Generally, if clinical evidence does not fully support the claimant's testimony concerning the intensity, persistence, or functional limitations of the impairment, then the ALJ must consider additional factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken by the claimant to relieve the symptoms; (5) other treatment received; (6) any other measures taken to relieve the symptoms; and (7) other factors.  *Id.* §§ 404.1529(c)(3)(i)–(vii), 416.929(c)(3)(i)–(vii).  "When evaluating the credibility of an individual's statements, the [ALJ] must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7P, 1996 WL 374186, at *4 (July 2, 1996).  "Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"  *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (quoting *Lennon v. Waterfront Transp.*, 20 F.3d 658, 661 (5th Cir. 1994)).

The ALJ found Mr. New's symptom complaints "not credible to the extent alleged," reasoning that "the objective medical evidence of record does not fully support those

allegations." (AR 24–25.) That reasoning is somewhat circular: when the objective medical

evidence does not fully support the claimant's testimony concerning the intensity, persistence, or

functional limitations of the impairment, then the ALJ must consider the additional factors listed

above. The Commissioner contends, however, that the ALJ properly relied on Mr. New's

activities of daily living. (Doc. 7 at 14.) Mr. New maintains that his activities, other than child

care, do not occur with the frequency necessary to show the ability to work a forty-hour week.

(Doc. 8 at 3.)

The ALJ did mention Mr. New's daily activities in his decision, asserting in particular

that he is able to care for his children and to do housework, personal care, meal preparation,

shopping, and driving. (AR 29, 31.) The Commissioner also notes several other portions of the

record regarding Mr. New's activities. (Doc. 7 at 14.)[4] But "'a claimant need not be an invalid

to be found disabled' under the Social Security Act." *Balsamo v. Chater*, 142 F.3d 75, 81

(2d Cir. 1998) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988)). The inquiry is

whether Mr. New engaged in activities for "sustained periods comparable to those required to

hold a sedentary job." *Id.* (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638,

643 (2d Cir. 1983)). The activities described in the record are not so comparable. Most

references in the record regarding Mr. New's activities include the caveat that the activity must

be brief, accompanied by frequent breaks, or performed with Ms. Stewart's assistance.[5]

---

[4] Mr. New reported to Dr. Scovner in February 2011 that he had been doing "a lot of shoveling." (AR 402.) He reported to Dr. Hazard in October 2013 that he had been doing some "light carpentry work." (AR 551.) At his March 15, 2012 visit to the Rutland Vermont Orthopedic Clinic, he stated that he enjoyed target shooting. (AR 331.) In his April 26, 2012 function report, he indicates that he typically goes for a "short walk" each day. (AR 252.)

[5] (*See* AR 50 (Ms. Stewart's testimony that "if he's doing a project, he would have to stop to either walk around, get up, shift, you know, move his body around every 15 to 20 minutes or so."); AR 52 (can lift a gallon of milk, but could not move it repetitively); AR 268 (Ms. Stewart "helps with ALL chores"); AR 269 (meal preparation longer than five to ten

The ALJ also remarked that the limitations assessed by Dr. Scovner are "not supported by the claimant's report of being able to function with medication." (AR 28.)  Indeed, Dr. Scovner noted on several occasions that pain medications allowed Mr. New to do activities, chores, and take care of the children.  As discussed above, however, Mr. New's daily activities are not sufficient to support a "non-severe" determination.

Finally, the ALJ's opinion is interspersed with a variety of suggestions seeming to impugn Mr. New's credibility.  Perhaps most importantly, the ALJ noted (as did Dr. Bull-Stewart) Mr. New's inconsistent statements about medication use, suggesting that he may have alleged back pain to obtain Vicodin.  (*See* AR 27.)  Dr. Bull-Stewart noted at a July 19, 2012 appointment that, despite being prescribed Vicodin, his urine toxicology screen was positive for cannabis and negative for opiates, and he was unable to explain those results, which caused her to suspect "possible drug diversion."  (AR 447–48.)[6]  This court has held that drug-seeking behavior is relevant to the credibility assessment.  *Rye v. Colvin*, No. 2:14-cv-170, 2016 WL 632242, at *12 (D. Vt. Feb. 17, 2016) (citing *Anderson v. Shalala*, 51 F.3d 777, 780 (8th Cir. 1995)).  On the other hand, drug diversion is not inconsistent with the presence of severe back pain.  Indeed, Dr. Bull-Stewart did not conclude that Mr. New's reports of pain were fabricated.  She stopped prescribing opiates, but increased his dosage of Lyrica, and directed him to take Excedrin or Tylenol for supplemental pain management, and continued to treat him for back pain.  (AR 448.)  This issue impacts Mr. New's credibility, but not enough to conclude that his back pain is non-severe.

---

minutes "requires breaks"); *id.* (cleaning "in small amounts"; folding laundry "with breaks"); *id.* (any repetitive task requires breaks); AR 270 (shopping "with help from" Ms. Stewart).)

[6] Dr. Scovner continued prescribing Vicodin between November 2012 and April 2013.  It is not clear from the record whether Dr. Scovner stopped prescribing opiates based on a similar suspicion of drug diversion.

For all of the above reasons, the court concludes that substantial evidence does not support the ALJ's determination at step two that Mr. New's back pain is not "severe."

### B.    Mental Health

Mr. New maintains that the ALJ erred by failing to find that his depression and social anxiety are "severe" impairments. The ALJ gave "no weight" to the opinions of Jacquelyn E. Bode, a psychologist who treated him in 2014. (AR 30.) The ALJ also applied the "paragraph B" criteria (the "special technique") to conclude that Mr. New's mental impairments are non-severe. (AR 31–32.) The Commissioner maintains that the ALJ reasonably found that Mr. New did not have a severe mental impairment.

### 1.    Opinion Evidence

In a treating source statement dated May 12, 2014, Ms. Bode states that she began treating Mr. New on February 3, 2014, seeing him approximately one hour per week for psychotherapy. (AR 612.) Ms. Bode's statement indicates that she is a "Lic[ensed] Psychologist, Masters," and that she earned an M.Ed. degree. (AR 617.) According to her evaluation, Mr. New has post-traumatic stress disorder (PTSD), social phobia, and depressive disorder (not otherwise specified). (AR 612.) Describing her clinical findings, Ms. Bode noted:

> Rates 10 (0–10) on numerous fears related to social phobia. Extremely anxious presentation. No eye contact. [History] of severe anxiety dating to childhood. [Difficulty with] concentration; insomnia; public avoidance; depressed; isolated; . . . fatigue, nausea, headaches; hopelessness; flashbacks; irritability; [history] of very low occupational/social/academic functioning in spite of adequate intelligence.

(*Id.*) She describes Mr. New's prognosis as "guarded." (*Id.*) She further identified a variety of "signs and findings" including anhedonia or pervasive loss of interest in almost all activities; decreased energy; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect;

apprehensive expectation; emotional withdrawal or isolation; persistent irrational fear of a specific object, activity, or situation resulting in avoidance; motor tension; emotional lability; deeply ingrained, maladaptive patterns of behavior; and sleep disturbance.  (AR 613.)

Ms. Bode further indicated that pain and fatigue are contributing factors to Mr. New's ability to work.  (*Id.*)  She states that psychiatric conditions exacerbate Mr. New's experience of pain, explaining that "pain increases depression and vice versa."  (*Id.*)  According to Ms. Bode's report, numerous aspects of workplace stress would exacerbate Mr. New's symptoms and would cause him to perform below a satisfactory level.  (AR 614.)  She also indicates "serious" (or greater) limitations in ten different mental abilities needed to work.  (AR 614–15.)  Regarding functional limitations resulting from Mr. New's mental impairments, Ms. Bode indicated "marked" limitations in activities of daily living and maintaining concentration, persistence, or pace; and "extreme" limitations in social functioning.  (AR 615.)  Ms. Bode further indicated that Mr. New has "[a]n anxiety related disorder and complete inability to function independently outside the area of one's home."  (AR 616.)  She estimated that Mr. New's mental impairments would cause him to be absent from full-time employment more than four days per month.  (*Id.*)

The ALJ gave "no weight" to Ms. Bode's opinion, reasoning that she first saw Mr. New on February 3, 2014; that there are no treatment notes to support her opinions; and that her training is in education not psychology.  (AR 30.)[7]  The court begins with the ALJ's third reason, which appears to be a suggestion that Ms. Bode is not an acceptable medical source.  An acceptable medical source is necessary to establish whether a claimant has a medically determinable impairment.  20 C.F.R. §§ 404.1513(a), 416.913(a).  The regulations define

---

[7] The ALJ also took issue with Ms. Bode's opinion that Mr. New has PTSD, but correctly noted that Mr. New does not allege PTSD in his application.  (*Id.*)

"acceptable medical sources" to include "[l]icensed or certified psychologists." 20 C.F.R.

§§ 404.1513(a)(2), 416.913(a)(2).

In Vermont, an individual is considered an "acceptable medical source" if all or part of

his or her title includes "Licensed Psychologist, Masters." *See Huestis v. Comm'r of Soc. Sec.*,

No. 2:13-cv-201, 2014 WL 4209927, at *6 n.6 (D. Vt. Aug. 25, 2014) (citing POMS DI

22505.004(A)(2), available at https://secure.ssa.gov/poms.nsf/lnx/0422505004). Ms. Bode's title

includes exactly that designation, and her licensure status is verified with Vermont's Office of

Professional Regulation. *See* State of Vermont License Lookup,

https://secure.vtprofessionals.org/Lookup/LicenseLookup.aspx (last visited Jan. 11, 2017). The

ALJ's observation about Ms. Bode's academic degree is not a basis to discount her opinion.

The ALJ's observation that Ms. Bode first saw Mr. New on February 3, 2014 is

insufficient to conclude that she is not a "treating source" under 20 C.F.R. §§ 404.1527(c) and

416.927(c). It is true that the opinion of a source who has examined a patient "only once or

twice" may not be entitled to the extra weight of a treating source. *Mongeur v. Heckler*,

722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam). Here, Ms. Bode states that she has seen

Mr. New for psychotherapy on an approximately weekly basis between February 3, 2014 and

May 12, 2014. That is sufficient to qualify her as a treating source.

Finally, the ALJ asserts that there are no treatment notes to support Ms. Bode's opinions.

That is also not a reason to give the opinions no weight. *See Soto-Cedeño v. Astrue*,

380 F. App'x 1 (1st Cir. 2010) (absence of treatment notes did not justify rejection of doctor's

opinion where doctor's report explained the basis for his opinion). Here, Ms. Bode's opinions

are based on psychotherapy and clinical findings. Moreover, the Social Security

Administration's own policy recognizes "the sensitivity and extra legal protections that concern

psychotherapy notes," and states that the administration "does not need the notes." *Fact Sheet for Mental Health Care Professionals*,

https://www.ssa.gov/disability/professionals/mentalhealthproffacts.htm.

The lack of treatment notes may have been a reason to order a consultative examination. *See Karl-Lebbrenz v. Colvin*, No. 12-CV-01099A, 2014 WL 3845414, at *10 (W.D.N.Y. Aug. 5, 2014). That was done in this case: Marc D. Carpenter, M.A. is a Licensed Psychologist—Master, and he examined Mr. New on May 22, 2012. (AR 436.) Mr. Carpenter noted that Mr. New presented as anxious during the session, but that he denied depressive symptoms, and that the symptoms he reported are more consistent with agoraphobia than with social anxiety. (AR 439.) Mr. Carpenter's impression is that Mr. New has "Panic Disorder With Agoraphobia." (*Id.*) It is not clear what weight the ALJ gave to Mr. Carpenter's opinion. Although Mr. Carpenter arrived at a different diagnosis than Ms. Bode, his opinion does not undermine the functional assessment offered by Ms. Bode.[8] It was error to give Ms. Bode's opinions no weight.

### 2.      Special Technique

At steps two and three, to evaluate the severity of mental impairments, the regulations require application of the "special technique" set forth in 20 C.F.R. §§ 404.1520a and 416.920a. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Under this technique, the reviewing authority first determines whether the claimant has a "medically determinable mental impairment." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If so, the reviewing authority must then "rate the degree of functional limitation resulting from the impairment(s) in accordance with

---

[8] In addition to Mr. Carpenter's opinion, the record also contains the report of licensed psychologist Steven B. Mann, Ph.D. Dr. Bull-Stewart had referred Mr. New to Dr. Mann. After interviewing Mr. New and performing psychological testing, Dr. Mann produced a report dated April 19, 2012. Dr. Mann diagnosed "social phobia, rule out conversion disorder." (AR 434.) Dr. Mann did not diagnose depressive disorder or PTSD, but his opinion also does not undermine the functional assessment offered by Ms. Bode.

paragraph (c)," *id.* §§ 404.1520a(b)(2), 416.920a(b)(2), which specifies four broad functional

areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace;

and (4) episodes of decompensation. *Id.* §§ 404.1520a(c), 416.920a(c). Under the regulations,

an impairment is generally not severe if the degree of limitation in the first three functional areas

is "none" or "mild," and if there are no episodes of decompensation. *Id.* §§ 404.1520a(d)(1),

416.920a(d)(1).

The ALJ found Mr. New to have "mild" limitation in the first three functional areas, and

no episodes of decompensation. (AR 31.) In light of the ALJ's failure to give any weight to

Ms. Bode's opinions, those findings are not supported. *See Krach v. Comm'r of Soc. Sec.*,

No. 3:13-CV-1089 (GTS/CFH), 2014 WL 5290368, at *6 (N.D.N.Y. Oct. 15, 2014) (ALJ

applied the special technique to find depression and anxiety to be non-severe, but erroneously

failed to assess opinion evidence). The ALJ's conclusions are also inconsistent with the findings

of agency consultants Edward Hurley, Ph.D., and Thomas Reilly, Ph.D., both of whom

concluded that Mr. New has "moderate" (not mild) difficulties maintaining social functioning.

(AR 69, 114.)

## II.      Harmless Error Analysis

As discussed in detail above, the ALJ erred by finding that Mr. New's symptoms are not

"severe" at step two. The Commissioner asserts that, even if the ALJ erred in his step two

determinations, the error was harmless because the ALJ articulated alternative reasons for

arriving at his "not disabled" determination. (*See* Doc. 7 at 12, 18.)

### A.      Physical Abilities and the Grids

The ALJ found that "[p]ursuant to the Medical Vocational Grid Rules, the claimant is not

disabled under all subcategories of a younger individual with a medium work capacity, capable

of perform[ing] all medium, light, and sedentary work." (AR 28.)  The Commissioner maintains

that, even if Mr. New does have a "severe" back impairment, he could still do medium, light, or

sedentary work.  (Doc. 7 at 15.)

That reasoning is flawed because the Medical-Vocational Guidelines ("the grids") "take

into account only exertional impairments." *Wallace v. Comm'r of Soc. Sec.*, No. 5:11-cv-26,

2012 WL 461809, at *10 (D. Vt. Jan. 10, 2012).  Where a claimant has nonexertional

impairments, use of the grids is appropriate "only if those impairments 'do not significantly

diminish the claimant's residual capacity to perform the activities listed in them.'"  *Id.* (quoting

*Evans v. Chater*, 84 F.3d 1054, 1056 (8th Cir. 1996)).  Here, the record—including

Dr. Scovner's May 2, 2014 statement and his treatment notes—indicate that Mr. New's back

pain results in nonexertional limitations, such as difficulty reaching overhead, climbing stairs,

stooping, and crouching.  Moreover, Ms. Bode's opinion suggests that Mr. New also has

additional nonexertional limitations stemming from his social phobia and depression.  Aside

from finding Mr. New's impairments to be non-severe (a finding that is not supported by

substantial evidence), the ALJ failed to make specific findings as to whether Mr. New's

nonexertional limitations significantly diminish his residual capacity.

## B.  Mental Health and the Unskilled Occupational Base

The ALJ found that "assuming the mental residual functional capacity opined by

Dr. Hurley and Dr. Reilly, the claimant would be able to perform the entire unskilled

occupational base."  (AR 31.)  Dr. Hurley and Dr. Reilly each supplied assessments of

Mr. New's mental residual functional capacity.  (AR 71–73; AR 116–18.)  The Commissioner

maintains that those assessments do not preclude unskilled work, the basic demands of which

include "the abilities (on a sustained basis) to understand, carry out, and remember simple

instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985). Mr. New does not disagree on that point, but maintains that the opinions of Dr. Hurley and Dr. Reilly should be given little weight. (Doc. 8 at 6.)

Here, substantial evidence does not support the ALJ's conclusion that Mr. New is able to perform the entire unskilled occupational base. This is because it was error to give Ms. Bode's opinion no weight, and because Ms. Bode's opinion assesses Mr. New with serious limitations in abilities necessary for unskilled work, such as accepting instructions from supervisors, responding appropriately to coworkers, and responding appropriately to changes in a routine work setting. (*See* AR 615.)

### III.   Title II (DIB) Claim and Disability Onset Date

The ALJ denied Mr. New's Title II (DIB) claim in its entirety on the grounds that Mr. New had not established any mental health condition or physical condition prior to December 31, 2010, his date last insured. The ALJ reasoned that none of Mr. New's medical records dated between January 31, 2008 and December 31, 2010 mentioned anxiety or depression, and that the first mention of back pain was on December 22, 2010, but at a February 3, 2011 appointment that pain was attributed to falling down the stairs and doing a lot of shoveling. (AR 23.)

To be eligible for disability under Title II of the Social Security Act, "a claimant must have been insured within the meaning of 42 U.S.C. § 423(c) at the onset date of his or her disability." *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see also Carpenter v. Astrue*, No. 5:10-cv-249, 2011 WL 3951623, at *10 (D. Vt. Sept. 7, 2011) (to obtain disability insurance benefits, "a claimant must demonstrate that his disability commenced during a period in which

he was entitled to [i]nsured status . . . . In other words, the onset date of disability must precede the date last insured" (citing 42 U.S.C. § 423(c); 20 C.F.R. §§ 404.101, 404.130, 404.131; and SSR 83-20, 1983 WL 31249, at *1 (Nov. 30, 1983))).  Mr. New does not challenge the ALJ's conclusion that his date last insured was December 31, 2010.  But he does argue that the ALJ erred in denying Title II benefits.

Here, because the ALJ determined that Mr. New was not disabled at any time between April 20, 2008 and June 25, 2014, it was unnecessary for the ALJ to follow the procedures prescribed in SSR 83-20 for determining the onset date of any disability.  *See Steen v. Comm'r of Soc. Sec.*, No. 2:10-CV-210, 2011 WL 2412594, at *7 (D. Vt. June 10, 2011) ("[I]n cases where the ALJ does not find the claimant to have been disabled at any point in time, the procedures prescribed in SSR 83-20 are inapplicable.").  If, on remand, the ALJ finds that Mr. New is disabled, then the ALJ should follow the procedures in SSR 83-20 to determine the onset date.

## Conclusion

Mr. New's Motion to Reverse (Doc. 6) is GRANTED.  The Commissioner's Motion to Affirm (Doc. 7) is DENIED.  The case is REMANDED for further proceedings and a new decision.

Dated at Rutland, in the District of Vermont, this ___ day of February, 2017.

_____
Geoffrey W. Crawford, Judge
United States District Court

27